UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> Plaintiff, <br> v. <br> ROBERT HAMILTON, <br> Defendant. | Case No. 21-cr-00202-WHO-1 <br><br> **ORDER DENYING MOTION FOR NEW TRIAL** <br><br> Re: Dkt. No. 129 |

Defendant Robert Hamilton, who was convicted of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1), moves for a new trial based on what he contends was an erroneous jury instruction. The motion is DENIED. Hamilton waived his challenge by failing to provide the specific grounds for any objection. And the instruction was not erroneous: It accurately reflected my prior order denying Hamilton's motion to suppress while excluding the potentially prejudicial reasons the police wanted to speak to him on the day of his arrest. It did not preclude one of Hamilton's theories of defense that the gun was planted or constitute judicial vouching. But if the instruction was indeed erroneous, any error was harmless. Hamilton forcefully argued the defense that there was reasonable doubt that he knowingly possessed the gun. However, the evidence that Hamilton possessed the weapon, coupled with the other jury instructions, make it clear beyond a reasonable doubt that a rational jury would have found him guilty absent the purported error.

## BACKGROUND

### I.   PRE-TRIAL

The events giving rise to this case begin on February 14, 2021, when three people were shot in San Francisco's Tenderloin neighborhood. *See* Order Denying Mot. to Suppress ("Mot. to

United States District Court
Northern District of California

1  Suppress Order") [Dkt. No. 39] 1:28-2:7.  Investigators had reasons to believe that Hamilton was

2  involved in the shooting, but they did not obtain a warrant for his arrest.[1]  *Id.* at 2-5.

3      About two weeks later, on February 27, San Francisco police officers saw Hamilton in the

4  Tenderloin.  *Id.* at 5:12-24.  When they attempted to speak to him, he fled on foot.  *Id.* at 5:25-6:4.

5  Officers pursued him and eventually brought him to the ground.  *Id.* at 6:3-19.  The police

6  handcuffed Hamilton and discovered a gun underneath his body.  *Id.* at 6:20-21.  They

7  subsequently searched Hamilton and a plastic shopping bag that he was carrying, finding items

8  including suspected marijuana, two digital scales, two cell phones, and approximately $6,700 in

9  various denominations of cash.  *See* Factual Stipulations for Trial [Dkt. No. 101] ¶¶ 3-5.

10      On May 13, 2021, Hamilton was charged by indictment with being a felon in possession of a

11 firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).  Dkt. No. 9.  On July 7, 2021, the

12 grand jury returned a superseding indictment charging him with one count of section 922(g)(1)

13 and one count of 18 U.S.C. § 924(c)(1), carrying a firearm in connection with a drug trafficking

14 crime and possession in furtherance of a drug trafficking crime.  Dkt. No. 23.

15      Hamilton moved to suppress the above evidence, arguing that police lacked probable cause

16 to arrest him.  *See* Mot. to Suppress Order at 7:19-24.  I denied the motion, finding that

17 Hamilton's stop and arrest were lawful.  *See id.* at 12:18-22.

18      On January 31, 2022, approximately three weeks before the trial began, the parties jointly

19 submitted proposed jury instructions.  Dkt. No. 81.  Although the parties agreed to most of the

20 instructions, three were disputed, including an instruction related to the legality of Hamilton's

21 arrest and search.[2]  *See id.* at 38-39.  The government's proposed instruction read:

22      The evidence in this case was obtained legally.  It is not for you to consider or to
23      speculate whether any evidence presented to you was obtained improperly or in
         violation of law.
24
25      You also may not speculate as to whether the police had any improper motives in

26 ───────────────
   [1] Hamilton was not charged in connection with the February 14 shooting.

27 [2] This was initially proposed as Instruction No. 30.  It became Instruction No. 4 in the final version
28 of the instructions that I read to the jury.  I will identify it as Instruction No. 4 for the purposes of
   this Order, however, some of the records cited within refer to it as Instruction No. 30.

                                                2

arresting or searching the defendant on February 27, 2021.

*Id*. at 38.  Hamilton's proposed instruction read:

> Whether or not the arrest and search of the defendant was lawful is a legal matter that has been resolved by the Court and that is not within the scope of your role as jurors.  It is not for you to consider or to speculate whether any evidence presented to you was obtained improperly or in violation of law.

*Id*. at 39.  Hamilton stated in his pretrial submission that his version would "sufficiently address any concerns that the jury might consider whether the arrest and search was legal."  *Id*.  The government's proposed instruction, he stated, "goes further than addressing that narrow concern, and its language would act to lend an official imprimatur and implied judicial stamp of approval to every action the officers took during the arrest."  *Id*.

At the pretrial conference, I decided several motions in limine and other evidentiary issues.  *See* Order on Evidentiary Issues [Dkt. No. 92] 1.  In part, I excluded evidence regarding the February 14 shooting under Federal Rule of Evidence 403.  *Id*.  I determined that this evidence would waste time, be more prejudicial than probative, and that its only potential relevance was to explain why police approached Hamilton on February 27.  *Id*. at 1:22-24.  To the last issue, I ruled that I would "instruct the jury as the parties proposed in their competing Jury Instruction No. 30 that I have resolved the legal issues involved in the arrest and search of Mr. Hamilton on February 27 and that jurors may not speculate whether it was obtained improperly or in violation of the law."  *Id*. at 1:24-27.  I told the parties that I would give the government's version of the instruction.  Otherwise, the government was permitted only to say that police stopped Hamilton on February 27 regarding an "unrelated investigation."  *See* Tr. at 7:11-8:10.

As stated to the jury, Instruction No. 4 read as follows:

> The evidence in this case was obtained legally.  It is not for you to consider or to speculate whether any evidence presented to you was obtained improperly or in violation of law.

> You also may not speculate as to whether the police had any improper motives in arresting or searching the defendant on February 27, 2021.

Final Jury Instrs. [Dkt. No. 109] 5.

## II.   TRIAL

United States District Court
Northern District of California

1    The trial lasted approximately two and a half days, from February 23 to 25, 2022.  Before

2    the government began its case, I read Instruction No. 4 to the jury.  Tr. at 159:17-160:4.  There

3    was no objection.  *See id*.

4    Some of the officers involved in arresting Hamilton testified.  San Francisco Police Officer

5    Joseph Navalle testified that when he arrived at McAllister and Jones Street on February 27, 2021,

6    he saw Hamilton running toward him, away from other officers.  Tr. at 165:10-20.  Navalle stated

7    that he tripped Hamilton, causing him to fall to the ground before getting back up and running.  *Id*.

8    at 165:13-20.  Navalle testified that he ran after Hamilton and while in pursuit, saw Hamilton

9    reach for his waistband.  *Id*. at 165:24-166:3.  The chase ended, Navalle stated, when a police car

10   cut off Hamilton's path, Navalle kicked him, and Hamilton fell to the ground.  *Id*. at 166:16-167:6.

11   Antone Haley, another San Francisco police officer, testified that he helped take Hamilton

12   into custody when Hamilton was on the ground.  Tr. at 186:6-11.  Haley stated that after he

13   handcuffed Hamilton, he lifted Hamilton's legs.  *Id*. at 187:2-15.  As Haley did so, he testified, he

14   saw a semiautomatic handgun underneath Hamilton's right hip.  *Id*.  Before Haley's redirect

15   examination, I repeated Instruction No. 4.  *Id*. at 227:2-10.  There was no objection.  *See id*.

16   The government submitted into evidence video footage from the officers' body-worn

17   cameras and photos of the gun as it was found.  A still image taken from Navalle's camera footage

18   showed the section of the street where Hamilton was ultimately taken into custody, before he was

19   apprehended.  *See* Tr. at 170:12-172:3 (citing Ex. 89).  No gun was visible on the ground before

20   Hamilton was arrested.  *See id*. at 172:1-3.  A still image from Haley's camera showed the gun

21   police found underneath Hamilton.  *See id*. at 190:4-19 (citing Ex. 44).

22   The jury also heard testimony from Ariel Lising, a criminologist with the San Francisco

23   Police Department Crime Lab, who interpreted the results of DNA testing of the gun.  Tr. at

24   333:19-334:25.  Lising testified that although DNA was found on the gun's grip and cartridges,

25   there was too little to draw any conclusions from the samples.  *Id*. at 334:11-335:20.  He further

26   testified that other DNA mixtures collected from the gun's slide, grip, and trigger were too

27   complex—meaning there were too many contributors—to compare the DNA to DNA from any

28   known individual.  *Id*. at 337:1-338:11.  Finally, Lising testified that a DNA mixture of four

4

1    contributors was found on the magazine and, after comparing the sample to Hamilton's DNA,

2    Hamilton was excluded as a contributor.  *Id*. at 338:12-339:3.  However, Lising said that finding

3    had "limited support."  *Id*. at 341:14-25.  On cross-examination, Lising testified that when the

4    DNA sample from the magazine was uploaded into an internal police database, it matched to

5    another case, which was associated with a different person.  *Id*. at 352:24-354:1.

6         I twice discussed the final jury instructions with the parties, before trial resumed on

7    February 24 and again before I delivered the final instructions on February 25.  *See id*. at 322:1-

8    325:21, 519:5-523:10.  At the first conference, Hamilton's counsel noted an objection to

9    Instruction No. 4 "for the record."  *Id*. at 324:1-19.  At the end of the second, both parties affirmed

10   they were "satisfied with the jury instructions as they currently exist."  *Id*. at 523:4-8.  I then read

11   Instruction No. 4 to the jury a third time with the final instructions to the jury.  *Id*. at 525:24-526:5.

12        The jury began deliberating on February 25.  It rendered its verdict the next business day,

13   February 28, convicting Hamilton of violating section 922(g)(1) but acquitting him of the section

14   924(c)(1) charge.  Dkt. No. 116.

15        On March 22, 2022, Hamilton moved for a new trial on the section 922(g)(1) charge,

16   arguing that Instruction No. 4 constituted judicial vouching for the conduct of the officers at the

17   time of Hamilton's arrest and affected the jury's consideration of whether the gun was planted.

18   *See* Mot. for New Trial ("Mot.") [Dkt. No. 129] 1:1-21.

19                                   **LEGAL STANDARD**

20        Under Federal Rule of Criminal Procedure 33(a), the court "may vacate any judgment and

21   grant a new trial if the interest of justice so requires."  When considering a motion for a new trial,

22   the district court "is not obliged to view the evidence in the light most favorable to the verdict, and

23   it is free to weigh the evidence and evaluate for itself the credibility of the witnesses."  *United*

24   *States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000) (citation omitted).  If, "despite the

25   abstract sufficiency of the evidence to sustain the verdict," the court concludes that the evidence

26   "preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may

27   have occurred," it may set aside the verdict and grant a new trial.  *Id*. (citation omitted).  That said,

28   the Ninth Circuit has held that a motion for a new trial should be granted only in "exceptional

United States District Court
Northern District of California

5

circumstances in which the evidence weighs heavily against the verdict." *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012) (citing *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981)).

## DISCUSSION

### I.   WAIVER

Federal Rule of Criminal Procedure 30(d) states that "[a] party who objects to any portion of the [jury] instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Challenges to jury instructions may be waived.  *See United States v. Kaplan*, 836 F.3d 1199, 1216 (9th Cir. 2016).  "A party forfeits a right when it fails to make a timely assertion of that right and waives a right when it is intentionally relinquished or abandoned."  *Id*.  "Waiver of a jury instruction occurs when a party considers the controlling law, or omitted element, and, in spite of being aware of the applicable law, proposed or accepted a flawed instruction."  *Id*. at 1217 (citation and quotation marks omitted).

Hamilton contends that his "argument in the proposed jury instructions raised the issues that he is asserting now" and that he reprised the objection at the charging conference.  Reply [Dkt. No. 131] 2 n.1.  Hamilton had ample opportunity to further object to Instruction No. 4: during the pre-trial conference, before and after trial each day, and at any of the three times I read the instruction to the jury.  He did not do so.  Instead, he affirmatively accepted the competing version of Instruction No. 4 on at least two occasions.

First, at the pre-trial conference I told the parties then that I intended to use the government's version of the instruction to avoid the need to introduce evidence of the February 14 shooting.  *See* Pre-Trial Tr. at 6:21-7:3, 28:7-17.  That was my sole focus for the instruction. Hamilton did not object orally or suggest that it would impact the jury's consideration of whether he possessed a gun on February 27.  *See generally* Pre-Trial Tr.

Nor did Hamilton object before the trial began, when I reiterated my intent to read the government's version of the instruction, or at any point when I actually read it to the jury.  *See* Tr. at 131:4-15.  I read Instruction No. 4 before the government presented its case in chief and again

6

1    before the government's redirect of Haley, after the government expressed concern that Haley's

2    testimony on cross-examination opened the door for the jury to speculate why the police stopped

3    Hamilton.  *Id*. at 159:17-160:4; *see also id*. at 225:16-226:24.  Before the second reading, I heard

4    arguments from the parties outside the presence of the jury about whether and how to address the

5    Hayley's testimony.  *Id*. at 225:16-226:24.  Hamilton's counsel stated that "the court's instruction

6    as to the legality of the stop was sufficient to advise the jury."  *Id*. at 226:16-17.  I stated that I

7    would repeat the instruction, to no objection.  *See id*. at 226:18-21.

8         The next day, when discussing the final jury instructions, Hamilton noted that he had

9    previously submitted an alternative version to Instruction No. 4 and objected to Instruction No. 4

10   "for the record."  *See* Tr. at 324:1-19.  He did not specify the grounds for his objection; offering an

11   alternative instruction does not suffice.  *See id.*; *see also United States v. Pineda-Doval*, 614 F.3d

12   1019, 1025 (9th Cir. 2010) ("Making a non-specific objection and then offering an alternative

13   instruction is sufficient only if it is clear from the record that the district court was aware of the

14   reasons for the defendant's objection.").  Critically, this came after I had already twice read the

15   instruction to the jury.  *See Kaplan*, 836 F.3d at 1217 (finding that the defendant waived any

16   objection to the jury instructions by affirmatively approving them "on several occasions.").

17        After he rested his case, Hamilton focused on an entirely different issue with the jury

18   instructions, requesting an additional "theory of defense" instruction addressing whether the

19   government could prove beyond a reasonable doubt that the substance he possessed was marijuana

20   rather than hemp.  *See* Tr. at 504:17-515:1; *see also* Dkt. No. 107.  Hamilton also proposed a

21   lesser-included offense instruction related to simple possession of marijuana.  *See* Tr. at 504:17-

22   515:1.  At no point during this conference was Instruction No. 4 mentioned.  *See id*., *see also*

23   Order Denying Requests for Additional Jury Instructions [Dkt. No. 110] 1-2.

24        The next day, February 25, I asked the parties if they were satisfied with the jury

25   instructions.  *See* Tr. at 523:4-9.  The government confirmed that it was, as did Hamilton.  *See id*.

26   I then read Instruction No. 4 a third time, as part of my final instructions to the jury.  *Id*. at 525:24-

27   526:5.

28        To the extent that Hamilton objected to Instruction No. 4 by proposing his own version, he

United States District Court
Northern District of California

7

1   accepted the instruction as I read it by affirmatively approving the instruction before I read it a

2   second time and in the final jury instructions as a whole.  He waived his challenge to Instruction

3   No. 4.  His motion for a new trial is DENIED on these grounds.

4   **II.      ERROR**

5          Even if Hamilton had not waived any challenge to Instruction No. 4, the instruction itself

6   was not erroneous.  "A district court has substantial latitude in crafting jury instructions, provided

7   that they fairly and adequately cover the issues presented."  *United States v. Luong*, 965 F.3d 973,

8   986 (9th Cir. 2020) (citations omitted).  A district court abuses this discretion "if the

9   instructions—taken as a whole and viewed in context of the entire trial—were misleading or

10  confusing, inadequately guided the jury's deliberations, or improperly intruded on the fact finding

11  process."  *United States v. Mikhel*, 889 F.3d 1003, 1058 (9th Cir. 2018) (citation and internal

12  quotation marks omitted).

13         **A.      Hamilton's Theory of Defense**

14         Hamilton first argues that Instruction No. 4 precluded jurors from considering his sole

15  defense to the section 922(g)(1) charge: "that reasonable doubt existed about whether officers

16  were the source of the gun at the scene of Mr. Hamilton's arrest."  Mot. at 4:27-5:2.  Hamilton

17  contends that the statement that "evidence in this case was obtained legally" was incompatible

18  with this theory because if the gun came from the police, it could not have been obtained legally.

19  *Id.* at 5:6-8.  He further argues that had police planted the gun, they would have acted with

20  "improper motives," to which the jurors were instructed not to speculate.  *Id.* at 5:11-14.  To

21  Hamilton, "[t]he cumulative effect of these statements was the same as if the court had instructed

22  the jury that police officers did not plant the gun under Mr. Hamilton."  *Id.* at 5:14-15.  This, he

23  contends, resolved that factual issue in the government's favor and relieved the government of its

24  burden of proving that Hamilton was guilty beyond a reasonable doubt.  *Id.* at 5:2-4.

25         It is true that the court may not intrude on the jury's fact-finding process.  *See Mikhel*, 889

26  F.3d at 1058.  But Instruction No. 4 did not do so.

27         I understood, and the parties argued, that Instruction No. 4 (or the defendant's version of

28  it) was necessary to address the issues decided in the motion to suppress, namely, whether the

United States District Court
Northern District of California

8

1    officers had cause to stop, chase, and arrest Hamilton on February 27.  I ruled that they did.  *See*

2    Dkt. No. 39.  The issue of planting the gun was never mentioned as a reason to modify the

3    instruction.

4            The jury instructions made clear that it was the government's burden to prove that

5    Hamilton knowingly possessed the firearm.  Instruction No. 15 laid out the elements of section

6    922(g)(1), specifically stating that for Hamilton to be found guilty, the government must prove

7    each element beyond a reasonable doubt, including that he "knowingly possessed a firearm" or

8    "knowingly possessed any item of ammunition."  Final Jury Instrs. at 16.  Instruction No. 16

9    defined "possession," stating that "[a] person has possession of something if the person knows of

10   its presence and has physical control of it or knows of its presence and has the power and intention

11   to control it."  *Id*. at 17.  Instruction No. 17 then defined knowingly, stating in part that "[a]n act is

12   done knowingly if the defendant is aware of the act and does not act through ignorance, mistake,

13   or accident."  *Id*. at 18.  Taken together, these instructions made clear that in order to convict

14   Hamilton of the section 922(g)(1) charge, the jury must find that he knowingly possessed either

15   the gun or the ammunition.  This left to the jury the factual determination of where the gun came

16   from.

17           Instruction No. 4 certainly did not stop Hamilton from raising the defense that the gun was

18   planted.  *See, e.g.*, Tr. at 174:17-175:3 (eliciting testimony from Navalle that when he first tripped

19   Hamilton, no gun fell out of his waistband or pockets); 177:19-178:9 (eliciting testimony from

20   Navalle that he saw the weapon for the first time after Hamilton was arrested); 239:15-241:3

21   (eliciting testimony from the case agent stating that none of the officers who arrested Hamilton

22   indicated in their reports that they saw him with a gun beforehand); 566:15-23 (arguing that no

23   one saw Hamilton with the gun prior to his arrest); 568:5-9 (arguing that if he had the gun, it

24   would have fallen from his pants as he ran from police); 569:20-24 (arguing that if Hamilton had

25   the gun, "his DNA would have been all over it"); 570:1-6 (noting that Hamilton's DNA was not

26   found on the gun or ammunition).  His theory of the defense was thoroughly aired before the jury

27   without objection.

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.    Judicial Vouching

"Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005) (citation omitted).  Doing so carries "the imprimatur of the government and may induce the jury to trust the government's judgment rather than its own view of the evidence." *Id*. at 1148 (citation omitted).

Hamilton argues that instructing the jury not to speculate that officers had any improper motives in arresting or searching him implied that police acted appropriately in doing so.  Mot. at 7:13-15.  He contends that this "positioned this court as a guarantor of the officers' motives" and "suggested the existence of information unavailable to the jury that allowed this court to make its guarantee." *Id*. at 7:15-18.  Moreover, Hamilton argues, "the statement that 'evidence in this case was obtained legally' bolstered the officers' credibility and the legitimacy of their conduct by suggesting that this court believed that the officers acted aboveboard." *Id*. at 7:18-20.

Both of the cases that Hamilton relies upon are distinguishable.  They involve vouching by the prosecution, not the court.  In *Weatherspoon*, the prosecutor gave the jury his personal impressions of the witnesses' credibility, describing one as "credible" and stating that another "told the truth."  410 F.3d at 1146-47.  The prosecutor also told jurors that he did not believe a third witness's statement was truthful. *Id*. at 1147.  In *United States v. Smith*, 962 F.2d 923, 933 (9th Cir. 1992), the vouching occurred when the prosecutor assured the jury that a witness "could not just 'get up here and say whatever he wanted to say'" because the prosecutor "would prosecute him for perjury if he did so," indicating that the prosecutor believed the witness's testimony was true.  The prosecutor then reinforced that message by asserting his own credibility as a government representative, telling the jury: "If I did anything wrong in this trial, I wouldn't be here.  The court wouldn't allow that to happen." *Smith*, 962 F.2d at 934.  The Ninth Circuit held that the prosecutor's statement not only invoked the "integrity of the government," but also "integrity of the court," placing the "imprimatur of the judicial system itself" on the witness's credibility. *Id*. at 936.

10

Unlike those cases, I did not personally assure the credibility of any witness at Hamilton's trial. Nor did Instruction No. 4 suggest that information not presented to the jury supported any witness's testimony. I instructed the jury on witness credibility, stating that in order to decide the facts of the case, it "may have to decide which testimony to believe and which testimony not to believe." Final Jury Instrs. at 11. In this same instruction, No. 10, I provided the jury a list of considerations when weighing a witness's testimony, including the witness's interest in the outcome of the case (if any), the witness's bias or prejudice (if any), whether other evidence contradicted the witness's testimony, the reasonableness of the witness's testimony in light of all the evidence, and any other factor bearing on believability. *See id.* I further instructed jurors that they "may believe everything a witness says, or part of it, or none of it." *See id.* Rather than vouch for any witness, I did the opposite, telling the jurors that they "may choose not to believe anything that witness said." *See id.*

### C. Necessity

Finally, Hamilton argues that Instruction No. 4 was misleading and unnecessary because he did not argue that police lacked probable cause or acted unreasonably in arresting him. Mot. at 7:25-8:5.

This overlooks two critical issues that risked confusing the jury and supports the necessity of Instruction No. 4. It removed from the jury's consideration the legality of Hamilton's arrest and search, a matter of law already determined on the motion to suppress. And it foreclosed the possibility that the jury speculate why police approached Hamilton on February 27.

Police stopped Hamilton because he was suspected in the February 14 shooting. *See* Mot. to Suppress Order at 5:12-24. As I determined on the motions in limine, evidence of that shooting was not relevant to the crimes for which Hamilton was charged. *See* Order on Evidentiary Issues at 1:16-27. Allowing that evidence to be introduced at trial—even to explain why police stopped Hamilton—risked prejudice to Hamilton that outweighed its probative value. *See id.* at 1:22-23. The purpose of Instruction No. 4 was to guide the jury's deliberation and keep it focused on the facts at issue, rather than already-settled matters of law or irrelevant considerations that risked prejudicing Hamilton.

1    Taken with the other jury instructions and viewed in context of the entire trial, Instruction

2 No. 4 was not misleading or confusing, did not inadequately guide the jury's deliberations, and did

3 not intrude on its fact-finding process.  *See Mikhel*, 889 F.3d at 1058.  There was no error.

4 **III.  HARMLESS ERROR**

5    But if I gave Instruction No. 4 in error, the error was harmless.  "[A]n instructional error

6 does not automatically warrant a new trial:  The defendant must show that the error affects

7 substantial rights."  *United States v. Chang*, No. 16-CR-00047-EJD-1, 2020 WL 5702131, at *15

8 (N.D. Cal. Sept. 24, 2020).  This is true under both the harmless error and plain error standards

9 articulated in Federal Rule of Criminal Procedure 52, which states:

10
11     (a) Harmless Error.  Any error, defect, irregularity, or variance that does not affect
       substantial rights must be disregarded.

12     (b) Plain Error.  A plain error that affects substantial rights may be considered even
13       though it was not brought to the court's attention.

14 An instructional error is harmless if it is "clear beyond a reasonable doubt that a rational jury

15 would have found the defendant guilty absent the error."  *United States v. Thongsy*, 577 F.3d

16 1036, 1043 (9th Cir. 2009) (citation omitted).

17    Fundamentally, Instruction No. 4 did not prevent Hamilton from arguing that there was

18 reasonable doubt that he knowingly possessed the gun or that police planted it.  As is shown by the

19 Hamilton's cross-examination and closing argument, Hamilton had ample opportunity to sow

20 seeds of doubt—and did so.

21    Some examples: On cross-examination, Hamilton elicited testimony from Navalle that he

22 did not see Hamilton with a gun as he chased him and saw the weapon for the first time after

23 Hamilton was arrested.  *See* Tr. at 177:19-178:9.  Navalle testified on cross-examination that when

24 he first tripped Hamilton—when he fell to the ground and got up running—no gun fell out of his

25 waistband, pockets, or the bag he was carrying.  *Id*. at 174:17-175:3.  Hamilton also elicited

26 testimony from the case agent stating that none of the officers involved in apprehending Hamilton

27 indicated in their reports that they saw him with a gun before his arrest.  *See id*. at 239:15-241:3.

28    In his closing, Hamilton emphasized that no one had seen him with the gun prior to his

1    arrest and that the body camera footage did not show "exactly how . . . the gun ended up

2    underneath" him.  Tr. at 566:15-23, 569:3-4.  He also argued that if he had the gun as alleged, it

3    not only would have fallen from his waistband as he ran from the police (including when Navalle

4    first tripped him) but that "his DNA would have been all over it because it would have been

5    rubbing all over his skin and his sweat."  *Id*. at 568:5-9, 569:20-24.  Instead, he argued, Lising

6    testified that Hamilton's DNA was not found on the gun or ammunition.  *See id*. at 570:1-6.

7    Hamilton further argued that the crime lab never compared the DNA swabs against any of the

8    "many, many officers who were on the scene that day," which he said was "reasonable doubt."  *Id*.

9    at 570:24-571:1.

10   But the evidence that Hamilton possessed the gun was more than convincing.  Navalle

11   testified that Hamilton reached for his waistband as he ran.  The body camera footage showed that

12   there was no gun in the street before Hamilton was kicked to the ground.  The images also showed

13   that the gun on the ground, directly under Hamilton's waistband.  Besides Hamilton's sheer

14   speculation, there was no evidence that the gun was planted.

15   Regarding the DNA, Lising testified that the gun did not have a measurable amount of

16   Hamilton's DNA—not that he never held it.  Lising stated that the DNA mixtures on the gun's

17   slide, grip, and trigger had too many contributors to compare to any known individual.  Although

18   the DNA mixture found on the magazine matched to a sample associated with another person,

19   there were three other contributors.  And although Hamilton was excluded as a contributor from

20   that particular DNA mixture, that finding only had limited support.

21   In short, the DNA analysis was either limited or inconclusive.  Weighed alongside the

22   other evidence—the testimony that Hamilton reached for his waistband as he ran, the body camera

23   footage showing there was no gun on the street before he fell to the ground, and the images

24   showing the gun directly underneath his waistband—the evidence showed beyond a reasonable

25   doubt that Hamilton knowingly possessed the gun.  And the other instructions laid out the findings

26   necessary to convict Hamilton of the section 922(g)(1) charge.  *See United States v. Miller*, 953

27   F.3d 1095, 1103-04 (9th Cir. 2020) (considering "other language in the jury instructions" in

28   determining an instructional error was harmless).  Instruction Nos. 15, 16, and 17 explained the

United States District Court
Northern District of California

13

elements of the crime, and defined "possession" and "knowingly." Final Jury Instrs. at 16-18.

Considering Hamilton's own argument, the evidence presented in the case, and the other instructions to the jury, it is clear beyond a reasonable doubt that a rational jury would have found Hamilton guilty of the section 922(g)(1) charge absent the purported error of Instruction No. 4. Any error resulting from Instruction No. 4 was therefore harmless.

## CONCLUSION

For these reasons, Hamilton's motion for a new trial is DENIED.

**IT IS SO ORDERED.**

Dated: May 6, 2022



William H. Orrick
United States District Judge

United States District Court
Northern District of California