1 | JODI LINKER
Federal Public Defender
2 | Northern District of California
ANGELA CHUANG
3 | Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
4 | 450 Golden Gate Avenue
San Francisco, CA 94102
5 | Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
6 | Email:        Angela_Chuang@fd.org

7

8 | Counsel for Defendant HAMILTON

9

10 | IN THE UNITED STATES DISTRICT COURT

11 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

12 | SAN FRANCISCO DIVISION

13

14 | UNITED STATES OF AMERICA,        **Case No.:** CR 21–202 WHO

15 |                Plaintiff,        **DEFENDANT'S SENTENCING
                                      MEMORANDUM**
16 |        v.
                                      **Court:**        Courtroom 2, 17th  Floor
17 | ROBERT HAMILTON,                 **Hearing Date:**  June 23, 2022
                                      **Hearing Time:**  1:30 p.m.
18 |                Defendant.

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

It started off like any other day playing basketball in the park, but ended with a bullet lodged in 11-year-old Robert Hamilton's neck. In that instant, Mr. Hamilton's life changed. He was temporarily paralyzed and had to learn to walk again. Even after he regained his mobility, for the next 17 years through the present day, he suffered from long-lasting effects of his injury. The bullet never came out of his neck and has relegated him to years of chronic pain, neuromuscular dysfunction, and myriad mental health issues, including Post-Traumatic Stress Disorder ("PTSD"). He treated himself for years by using large amounts of marijuana daily, but still struggled to cope with his pain, his nightmares, and his anxiety. But he is determined to overcome those obstacles so that he can focus on what matters most to him—his family.

Mr. Hamilton now comes before this Court for sentencing on a charge of Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1). He asks the Court to take into consideration his personal circumstances and the significant trauma he has experienced in the past that has shaped his life since then. He respectfully requests that the Court impose a sentence of 20 months. Such a sentence is appropriate based on the factors delineated in 18 U.S.C. § 3553(a).

**ARGUMENT**

In sentencing Mr. Hamilton, this Court must consider all of the directives set forth in 18 U.S.C. § 3553(a); the Guidelines are only one factor among many to be considered by the Court. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). "The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant; and (6) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Section 3553(a) also directs the Court to consider additional factors, including: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of

DEF'S SENT. MEM.
*HAMILTON*, CR 21–202 WHO

1

1    sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing

2    Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, §

3    3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

4         Mr. Hamilton agrees with the Guidelines calculation in the Presentence Report ("PSR"), with a

5    final Offense Level of 14 and a Criminal History Category of IV. *See* PSR ¶¶ 22, 31. The resulting

6    advisory Guidelines range is 27–33 months.

7    **I.      The PSR Correctly Calculated The Offense Level As 14**

8         The PSR calculates a final offense level of 14. PSR ¶ 22. As noted by Probation, the draft

9    report originally calculated a higher offense level based on inclusion of a four-level enhancement for

10   possession of a firearm and ammunition in connection with another felony offense (narcotics sales)

11   under U.S.S.G. § 2k2.1(b)(6). *See* PSR Addendum ¶ 1. After consideration of objections, Probation

12   ultimately agreed that the enhancement should not apply in Mr. Hamilton's case. *See id.* Mr.

13   Hamilton joins Probation's analysis in finding that the four-level enhancement does not apply and

14   that the final offense level is 14.

15        Mere possession of a firearm and drugs is not enough for this enhancement to apply. Nor would

16   mere possession of a firearm while selling drugs be enough for it to apply. Rather, the government

17   "must show that the firearm was possessed in a manner that permits an inference that it facilitated or

18   potentially facilitated—*i.e.*, had some potential emboldening role in—a defendant's felonious

19   conduct." *United States v. Gonzales*, 506 F.3d 940 (9th Cir. 2007).

20        This is, of course, precisely the conduct that the jury acquitted Mr. Hamilton on in Count Two.

21   Moreover, there was no proof at trial that Mr. Hamilton was engaged in actual drug sales at the time

22   of arrest, and whether he possessed marijuana with the intent to distribute was hotly contested at

23   trial—he was nether charged with nor found guilty of possession with intent to distribute marijuana.

24   The fact that the drug at issue is marijuana is significant as well. Marijuana, unlike most other drugs,

25   is legal under state law; it is widely available at dispensaries all over San Francisco, and can even be

26   delivered to one's door within hours. It is no longer a "black-market" drug that someone would need

27

28

DEF'S SENT. MEM.
*HAMILTON*, CR 21–202 WHO

a gun to protect—essentially, there is no need to be "emboldened" to possess or distribute marijuana.[1] That sets it apart from other harder drugs, such as methamphetamine, that do not enjoy the same unique status and legality under state law as marijuana. Furthermore, it would make far more sense for a person like Mr. Hamilton, with a long history of PTSD as a victim of random gun violence, to have a gun for self-defense rather than in connection with possession with intent to distribute marijuana. Therefore, Probation's calculation of a final offense level of 14 is correct.

## II.   A Sentence Of 20 Months Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of § 3553(a)

The § 3553(a) factors demonstrate that a downward variance to 20 months is an appropriate and reasonable sentence in Mr. Hamilton's case.

### A.   The nature and circumstances of the offense

On February 27, 2021, San Francisco Police Department ("SFPD") officers saw Mr. Hamilton on a sidewalk. PSR ¶ 6. They suspected his involvement in an unrelated shooting that had occurred two weeks prior. *Id.* ¶ 6. When the police attempted to stop Mr. Hamilton, he ran away on foot. *Id.* Officers tackled him on the ground in a crosswalk after a patrol car cut him off. *Id.* ¶ 7. After he was cuffed, officers rolled him onto his side and found a loaded pistol under his body. *Id.* ¶ 8. They separately found approximately 11 ounces of marijuana, suspected promethazine, a digital scale, and just under $7,000 in cash. *Id.* ¶ 9.

Mr. Hamilton was charged in a Superseding Indictment with one count of 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm and Ammunition (Count One), and one count of Carrying a Firearm in Connection with a Drug Trafficking Crime and Possession in Furtherance of a Drug Trafficking Crime (Count Two). *Id*. ¶ 2. Following a jury trial, he was acquitted of Count Two and convicted of Count One. *Id.* ¶ 3.

### B.   Mr. Hamilton's history and characteristics

Mr. Hamilton, a native of San Francisco, was largely raised by his mother as the sole parental

---

[1] DEA Agent Mateer opined at trial that it is "common" for marijuana dealers to possess guns to protect their drugs, but it was clear from cross-examination that this opinion was based on anecdotal evidence rather than any sort of quantitative analysis, and was not specific to Mr. Hamilton's state of mind.

DEF'S SENT. MEM.
*HAMILTON*, CR 21–202 WHO

3

1    figure in his life—his father made only infrequent appearances in his childhood. *See* PSR ¶ 47–48.

2    His father did not provide any financial support for the family, leaving it to Mr. Hamilton's mother to

3    try to make ends meet as best she could. *Id.* ¶ 48. She was usually able to meet his basic housing and

4    food needs, but the family was not well-off by any means and they struggled financially. *Id.* Perhaps

5    because of their reliance on each other, Mr. Hamilton and his mother developed an incredibly close

6    relationship that persists to this day; he considers her his best friend. *Id.* ¶ 49. Because of their tight-

7    knit relationship, it worries Mr. Hamilton to no end that her physical and mental health are

8    deteriorating. *Id.* ¶ 52. She suffers from chronic health issues, she sometimes uses a cane to help with

9    her mobility, and she is going to undergo hip replacement surgery in the near future. *Id.* ¶ 52. Prior to

10   Mr. Hamilton's incarceration on the instant matter, he lived with her and helped to take care of her by

11   making sure she gets the special food that she needs and taking her to doctor's appointments—

12   something he has done for the past several years. *Id.* If she does not receive the proper diet, that can

13   trigger seizures, *see id.,* something that Mr. Hamilton has witnessed in the past. Needless to say, his

14   caretaking responsibilities are important to assist with her daily activities and needs; his prolonged

15   incarceration would remove that stability from her life. The importance of Mr. Hamilton's presence is

16   only increasing with time as his mother ages, which brings with it a new set of issues, such as

17   problems with her memory that are beginning to surface. *See id.* And though Mr. Hamilton's father

18   was largely absent from his childhood, Mr. Hamilton hopes to rekindle that relationship and to assist

19   his father in the same way that he does his mother, by taking him to appointments such as physical

20   therapy sessions. *See id.* ¶ 53; Declaration of Angela Chuang in Support of Defendant's Sentencing

21   Memorandum ("Chuang Decl."), Ex. A (Letters of Support, Stephanie Warren Letter).

22        The course of Mr. Hamilton's life changed suddenly and unexpectedly at the age of 11, when

23   he was shot in the neck by an AK-47 while playing basketball at a park. *Id.* ¶ 50. He was one of

24   several children who were struck, all of whom thankfully survived. *Id.* But that is not to say that it did

25   not leave substantial scars—physically and emotionally—that reverberate to this day. As his former

26   pediatrician writes, "A random gun-shot wound to the back of his neck left him with chronic

27   neuromuscular pain & dysfunction. Of note, the bullet was not able to be removed due to its position

28   near a critical organ structure which would be even more injurious if disturbed [sic] surgically,

1  contributing to chronic anxiety." *See* Chuang Decl., Ex. A (Letters of Support, Dr. Carol Miller

2  Letter). What this means is that in one split second at a neighborhood park, Mr. Hamilton was

3  sentenced to a life of chronic pain, neuromuscular dysfunction, and anxiety—the source of which can

4  never be removed.

5       It goes without saying that being shot in the neck as a mere child indelibly shaped his

6  subsequent years. In the immediate aftermath of this horrifying event, Mr. Hamilton was paralyzed

7  on his left side, and it was only through surgery and extensive physical therapy that he regained

8  mobility. *See* Chuang Decl., Ex. A (Letters of Support, Stephanie Warren Letter). He had to learn

9  how to walk again and he developed scoliosis. *See* PSR ¶ 56. It is no surprise that he suffers from

10  PTSD, depression, and anxiety stemming from his near-death experience and the long-lasting

11  ramifications of his injury. *See id.* ¶ 57. Shortly after he was shot, when he was 13 years old, Mr.

12  Hamilton also began using marijuana as a form of self-medication for not only his physical pain, but

13  also his anxiety. *See id.* ¶ 59. Soon enough, he was using marijuana daily and heavily. *Id.* He

14  understands that he needs to address the roots of his mental health issues that are driving his

15  substance use, giving him nightmares during stressful times, and causing hypervigilance; to that end,

16  he has been taking Remeron as prescribed for the past year and is open to participating in mental

17  health counseling. *See id.* ¶ 57.

18       Despite his mental health struggles, his chronic pain, and his significant childhood trauma,[2] Mr.

19  Hamilton has tried to give back to the community when he could. For many years, he has volunteered

20  with Visitacion Valley Strong Families at various events and participated in numerous different

21  community-based programs. *See* Chuang Decl., Ex. A (Letters of Support, Lesette Gray Letter). In

22  the past four years, he has also been involved with a program at Young Community Developers, Inc.

23  ("YCD"), which includes job training among other supportive services. *See* Chuang Decl., Ex. A

24  (Letters of Support, Quincy Collins Letter). He was "a top student and . . . successfully completed the

---

[2] It is important to note that Mr. Hamilton's ACEs score of 4, *see* PSR ¶ 58, does not take into account any community violence or violence at the hands of someone outside the household. What that means is that the single most traumatic and impactful event in Mr. Hamilton's life—being shot in the neck and nearly dying at 11 years old—is not taken into consideration at all by the ACEs assessment.

DEF'S SENT. MEM.
*HAMILTON*, CR 21–202 WHO

5

JRT course." *See id.* Mr. Hamilton fully intends to seek out and to continue working with these

community-based organizations upon his release. Mr. Hamilton has already begun to plan for the

future in other ways as well. He is interested in several potential careers, including in construction or

as a barber. *See* PSR ¶ 62.

It is a credit to his character that his former pediatrician chose to write a letter on his behalf,

something that she has never done before; in her own words, "This is the first time I have felt

compelled to write such a letter but do so because I believe that while Robert is now facing serious

consequences of perhaps a poor behavior choice, he has not lost his aspirations to find where he can

best contribute to uplifting his community, help his sister support their elderly mother and move his

life onto a productive pathway." *See* Chuang Decl., Ex. A (Letters of Support, Dr. Carol Miller

Letter). Mr. Hamilton's history and characteristics clearly support a downward variance.

**III.   The Court Should Order That Mr. Hamilton's Federal Sentence Run Concurrently With
Any Future State Sentence In His Pending State Case**

**A.      This Court has the authority to order a federal sentence to run concurrently with a
state sentence that has yet to be imposed**

As a threshold matter, it is important to note that this Court has the inherent authority to order

that a federal sentence be served concurrently with or consecutive to a state sentence that has not yet

been imposed. *Setser v. United States*, 566 U.S 231, 236–37 (2012) (holding that district courts'

sentencing discretion extends to selecting whether the sentences they impose will run concurrently or

consecutively with a state sentence that is not yet imposed, and that 18 U.S.C. § 3584 does not curtail

this inherent discretion); *see* U.S.S.G. §§ 5G1.3(c), (d) (providing guidance for courts to run

sentences concurrently to anticipated state or other undischarged terms of imprisonment). The *Setser*

Court went on to explain that "it is always more respectful of the State's sovereignty for the district

court to make its decision up front rather than for the Bureau of Prisons to make the decision *after* the

state court has acted. That way, the state court has all of the information before it when it acts." *Id.* at

241.

**B.      If this Court stays silent on whether the federal sentence should be concurrent
with a future state sentence, the sentences will run consecutively**

According to the BOP's interpretation of 18 U.S.C. § 3584(a), when a federal commitment

DEF'S SENT. MEM.
*HAMILTON*, CR 21–202 WHO

1    order is silent as to whether the federal sentence should run concurrently with, or consecutive to, a

2    future state sentence, the sentences will be run consecutively. *See* Chuang Decl., Ex. B at 1-31–1-32[3].

3    The BOP derives its interpretation from the provision in § 3584(a) stating that, "Multiple terms of

4    imprisonment imposed at different times run consecutively unless the court orders that the terms are

5    to run concurrently." 18 U.S.C. § 3584(a); Chuang Decl., Ex. B at 1-31. Accordingly, the BOP will

6    automatically run a federal sentence consecutively to a future state sentence *unless* the federal

7    sentencing judge orders that it run concurrent—this interpretation is based on the statutory language

8    and the legislative history of the subsection. *See* Chuang Decl., Ex. B at 1-31–1-32 ("If . . . multiple

9    terms of imprisonment are imposed at different times without the judge specifying whether they are

10   to run concurrently or consecutively, they will run consecutively unless the statute specifies

11   otherwise."); Chuang Decl., Ex. C at 41 ("If the federal Judgment and Commitment Order is silent

12   and if the state authorities have primary jurisdiction over the defendant, the default by the BOP is to

13   compute the federal sentence as consecutive with the state sentence . . .").

14        In Mr. Hamilton's case, the state authorities have had primary jurisdiction over him since he

15   was arrested by SFPD on February 27, 2021. He remained in state custody until he was transferred to

16   federal custody on a writ on April 23, 2021. *See* PSR at 1 (Release Status). Crucially, the state

17   authorities never relinquished him from their custody, meaning that they still have primary

18   jurisdiction over Mr. Hamilton. The fact that he was brought to this Court on a writ of *habeas corpus*

19   *ad prosequendum* does not change primary jurisdiction; the federal authorities essentially "borrowed"

20   him from state custody for the purposes of prosecuting this matter. *See, e.g.*, *Taylor v. Reno*, 164 F.3d

21   440, 445 (9th Cir. 1998). Therefore, because of BOP's interpretation of § 3584(a), this Court's

22   silence at sentencing on the concurrent-vs-consecutive issue vis-à-vis a future state sentence would

23   have the practical effect of subjecting Mr. Hamilton to consecutive sentences.

24        **C.    The Court should order that Mr. Hamilton's sentence run concurrently with any**
         **future state sentence in his pending state case to avoid precluding concurrent**
25       **sentences**

26        Because the state is its own sovereign, the state court judge is free to decide how a state

---

[3] For ease of reference, this motion will use the page numbers on the upper right-hand corner of Exhibit B and the page numbers on the lower right-hand corner of Exhibit C.

DEF'S SENT. MEM.
*HAMILTON*, CR 21–202 WHO

1   sentence will be counted by state authorities, regardless of the federal sentence. However, because of

2   how BOP computes the *federal* sentence, the *only way* for a federal sentence to actually run

3   concurrently to a future state sentence when a state has primary jurisdiction is for the federal

4   sentencing judge to clearly signal such intent by ordering concurrency. *See* Chuang Decl., Ex. B at 1-

5   32A; Chuang Decl., Ex. C at 42 ("[S]entencing orders are not always clear, forcing the BOP to make

6   an interpretation . . . . [D]elineation [of the federal sentencing judge's intent] would be helpful to the

7   BOP, whose practice is to try to follow (to the extent possible) the intent of the federal sentencing

8   judge."). Essentially, if this Court orders the federal sentence to run concurrently to a future state

9   sentence, that does not guarantee that the sentences would actually be concurrent because the state

10  court judge could always decide to run the state sentence consecutively. But if the Court does *not*

11  order concurrency, that decision is taken out of the state court judge's hands and the sentences will

12  necessarily run consecutively.

13      This Court should therefore order that Mr. Hamilton's sentence run concurrently with any

14  future state sentence yet to be imposed in his pending state matter, San Francisco County Superior

15  Court Case No. 21002192.[4] Otherwise, through no fault of his own, he would not receive any credit

16  towards his federal sentence for the past 15+ months that he has spent in custody while his state case

17  has been on hold awaiting resolution of this case.

18                                  **CONCLUSION**

19      For all the reasons set forth above, Mr. Hamilton respectfully requests that the Court impose a

20  sentence of 20 months to run concurrently with any future sentence on San Francisco County

21  Superior Court No. 21002192. Such a sentence is sufficient but not greater than necessary to achieve

22  the sentencing goals laid out in § 3553(a).

23

24

25

26

27

28

---

[4] BOP implements this concurrency by designating the state institution as a place where the federal sentence can be served pursuant to its authority under 18 U.S.C. § 3621(b), thus allowing the federal sentence to commence while state authorities have primary jurisdiction. *See Setser*, 566 U.S. at 235.

DEF'S SENT. MEM.
*HAMILTON*, CR 21–202 WHO

1

2
   Dated:     June 16, 2022                         Respectfully submitted,

3
                                           JODI LINKER

4
                                          Federal Public Defender
                                          Northern District of California

5

6
                                          /S

7
                                          ANGELA CHUANG
                                          Assistant Federal Public Defender

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEF'S SENT. MEM.
*HAMILTON*, CR 21–202 WHO

9